## Ross Foll v. The People of the State of Illinois.

1. CRIMINAL LAW—*Labor on Sunday.*—Labor on Sunday is not an offense under section 261 of the Criminal Code, unless it is done in a way to disturb the peace and good order of society.

2. SUNDAY LAWS—*Persons Observing Other Days.*—The fact that section 261 of the criminal code is not to be construed so as to prevent the due exercise of the rights of conscience of any person who thinks proper to keep any day other than Sunday as a Sabbath, will not shield such a person from the penalty of the statute if, by his labor, the peace and good order of society are disturbed.

**Prosecution,** for disturbing the peace, etc., by labor on Sunday. Appeal from the Circuit Court of Richland County; the Hon. SILAS Z. LANDES, Judge, presiding. Heard in this court at the February term, 1896. Reversed and remanded. Opinion filed September 5, 1896.

R. N. McCAULEY and G. A. HOFF, attorneys for appellant.

H. G. MORRIS, State's Attorney, for the appellee.

MR. PRESIDING JUSTICE GREEN DELIVERED THE OPINION OF THE COURT.

Ross Foll was complained against by William Bates, before a justice of the peace, and in the complaint it was charged that on the 4th day of August, 1895, within Richland county, Illinois, said Ross Foll "did then and there disturb the peace and good order of society by labor, and by amusement and diversion, on Sunday." On the hearing upon this complaint before the justice, Foll was found guilty and sentenced to pay one dollar fine and costs of suit. He took an appeal to the Circuit Court, where a jury found him guilty "in manner and form as charged," and assessed against him a fine of one dollar. Defendant entered a motion for a new trial, which the court overruled and entered judgment on the verdict for one dollar and costs. From this judgment defendant took this appeal. This prosecution is based upon Sec. 261, Chap. 38, entitled

"Criminal Code," which provides, "Whoever disturbs the peace and good order of society by labor (works of necessity and charity excepted), or by any amusement or diversion on Sunday, shall be fined not exceeding $25. This section shall not be construed to prevent watermen and railroad companies from landing their passengers, or watermen from loading and unloading their cargoes, or ferrymen from carrying over the water travelers and persons moving families, on the first day of the week, nor to prevent the due exercise of the rights of conscience by whomsoever thinks proper to keep any other day as Sabbath."

In support of the complaint the following testimony was introduced:

William Bates testified he lived a little over an eighth of a mile from defendant; that on July 28th saw defendant plowing; it was Sunday, about 9 o'clock; did not see him any more that forenoon; he was plowing along near a public highway. In answer to the question, "What effect, if any, did this work of plowing by Ross Foll on this Sunday have upon you?" he said, "It bothered me a good deal." In answer to the question, "Did members of your family complain about it?" he testified, "Yes, sir; I heard my mother and stepfather talking about it;" and further testified, "I went south to Sunday school that day, at the church that is on that road. Persons would have to go by him to get to church if they came from that direction. They had church or Sunday school every Sunday; Sunday school at half past nine o'clock; church at half past ten o'clock. That was in this county and State." On cross-examination he testified, "I was bothered when I saw this working. It disturbed me; bothered my mind; I don't belong to any church or religious organization. It was working on Sunday and making a noise disturbed my mind; hollering at his horses once in a while; he said, 'Get up!' and hollering 'Whoa;' did not hear him swear; I was about half a quarter from him while he was plowing, and it was about a mile from there to the church. The road that runs south from where he was plowing runs right by

the church; he was plowing a little east of that road. The church is on a cross road. I did not pass where he was plowing that morning in going to Sunday school; my house is a little over half a quarter south from where he was plowing.".

Preston Hickle testified he lived three or four hundred yards from the defendant; that he saw defendant plowing on Sunday, July 28th, about two lands from the public road. "It bothered me to see a man plowing on Sunday. My wife complained about it. The road is traveled very much; persons who live north of that place where he was plowing pass it going to church. There are two denominations use that church every other Sunday. They have prayer meetings through the week, and Sunday school." On cross examination he testified he was not a member of any religious organization; that he had no ill malice to defendants till they went into this; "they had me arrested for a crime and I paid my fine." On re-examination, he testified he had no ill feeling against this defendant; "but don't like to see Sunday work going on around me. Of course I was not raised that way, but I don't belong to any church. I frequent the church and my family goes there, and had to pass this road when we go to church there." On recross-examination, he testified he had not paid, or promised to pay, a cent in connection with this prosecution; "I do not expect to unless I have to, and if I do I have got it."

Mrs. Mary Lozier testified she lived half a quarter from defendant; that she saw defendant plowing in his field on Sunday, July 28th. "It bothered me to see him working and hollering at his horses on Sunday." In answer to the question, "Did you complain to anybody about it?" she answered, "Yes;" and in answer to the next question, "Who to?" said, "Our folks at home." On cross-examination, which was very short, she testified, that he was plowing on Sunday; "disturbed my mind I guess."

Mrs. Hudson testified she lived about half a mile from defendant; saw him plowing; heard him hollering on Sun-

day, July 28th. " Have known defendant for years, and
have been neighbors as nice as anybody could wish to have
till these Adventists got in there, and now there is nothing
but Sunday work the whole time, and I was near about
worried to death." Here counsel for the prosecution said to
witness, " You need not tell about that;" but witness con-
tinued by saying, " I don't stop till after I tell what I took
my oath to tell. They never acted that way in all these
years till these cranks crowded in there." On cross-exami-
nation she testified, in answer to the question, " You say
the Adventists had crowded in there pretty thick ? " " No,
sir; there's only four families in the settlement; the families
that came in are all there yet, and others will be coming in.
I think anybody working on Sunday is throwing an insult
right in our face;" and then testified, "I wasn't used to
that and don't want to get used to it. I don't care what Sun-
day good people keep, but don't like to see people work on
Sunday. It disturbs me to see them getting to be cranks.
I say they are just another lot of cranks come in to get
men all mixed up. That is my opinion, and I think I am
right. I don't like to see cranks. I call them cranks." In
answer to this question, " You call that class of people, who
belong to another religious organization than your own,
cranks ? " she then testified, "And they used to be good cit-
izens, and I always thought so till these cranks came in; I
call them cranks, and I think I am right." She was then
asked, " Because they work on Sunday ?" and answered,
" Does it look like anything else but cranks ? It hurts my
feelings and disturbs my mind. I have been trying to obey
the laws of the United States and do right. I never heard
of the like of this till in the last two or three years, and you
might know it would disturb me. I don't care what kind of
religion they have if they will quit rearing around on Sun-
day, so I don't see or hear them; but I don't want to see them
work on Sunday, contrary to the law of God and the United
States. You are a sharp man, and you know yourself it is
wrong. I knew these folks before they joined the Advent-
ists, and they were always as nice citizens and neighbors as

I would wish to have before that. I lived for ten or twelve years near them, and they were all right till these cranks came in there and started this new religion. Working on Sunday, and reading out certain prayers at Sunday school, and starting people on the road to ruin, is the objection I have to them." . Witness was then told by defendant's counsel, " That is all; " 'but continued by saying, " It worries me to death to hear and see them." She was then told by the counsel for the prosecution, " That is all; stand aside;" but said, " It worries me to death," and was again told by said counsel, " Stand aside; that is all, Mrs. Hudson;" and the prosecution then rested.

Defendant testified on his own behalf that he was a man of family; had lived in the county about twenty years, and belonged to the church of Seventh Day Adventists; had been a member for two years. " We have a church organization there and have preaching, Sabbath school and prayer meeting. I attend services of the church every Sabbath, and prayer meeting, and keep the seventh day—that is Saturday—as the Sabbath of the Lord. On that day I go to Sabbath school and we have bible reading and prayer meeting after Sabbath school, and I then go home and stay there the rest of the day, and don't run around. I was plowing on the 28th of July last. Did not make an unreasonable noise. They had been making talk about working on a Sunday, and I generally keep still that day, as I don't want to disturb them, and I didn't mean to disturb anybody. I worked to make a living, as I am a poor man. It is an old field in which I was plowing and contained three acres. I was plowing in the field by the road running east and west, and not by the road running south to the church. The church is about a mile from where I was plowing." On cross-examination he testified, " I plowed until noon; wasn't plowing on the road running to the church, but about half a quarter from it. A few people passed along to get to the other road to go to church while I was plowing. I keep Saturday as my Sabbath, because the Lord tells me to."

John Foll, for defendant, then testified : " I am father of

defendant.  On Sabbath morning, July 28th last, he went out to plow and after a while I went out and saw him plowing a couple of lands from the road.  I did not know he was plowing until then.  If he had been hollering I would have heard it.  Hickle's house is right east of us.  I was between defendant and Hickle.  Our house is several hundred yards from place of plowing.  My son is a member of the Seventh Day Adventist church and keeps Saturday, the seventh day, as his Sabbath, as decreed by the Lord.  He attends every meeting and takes part in prayer meetings.  He keeps the Sabbath, or Saturday as you call it, and never works on that day."

Richard Worrell was called and testified to defendant's good reputation, and it was conceded on behalf of the people that he is a young man of good reputation.

Sherman Hatton was called by defendant to show that witness Bates helped him on a Sunday hive a swarm of bees.

The foregoing is all the evidence introduced at the trial, and upon the facts thus proved, it is claimed the conviction is just.

We have examined all the cases where this section 261 is referred to by our Supreme Court, and here reproduce them.

Johnston v. People, 31 Ill. 473: A recognizance was objected to because it was taken and acknowledged on Sunday, on the ground that it was a violation of that section of the law that imposes a fine against any person who shall knowingly disturb the peace and good order of society by labor or amusement on Sunday, except works of necessity and charity.  The court defines works of necessity not to be a physical and absolute necessity, but a moral fitness or propriety of the work done under the circumstances of each particular case.

Scammon v. City of Chicago, 40 Ill. 146: The question was as to the publication of a notice, one day of which days of publication was on Sunday.  It was held that the notice was not legal, one of the days of publication having been on Sunday, and the same section of the Criminal Code was commented on, and it is said the object of the law is to se-

Foll v. The People.

cure to every individual in a community the right to pass Sunday either in religious exercises or in the quiet seclusion of his home, without a liability to annoyance from the ordinary secular pursuits of life, except so far as they may be dedicated by necessity or charity. No person should be permitted to follow his ordinary secular occupation if by so doing he disturbs that portion of the community which desires to devote the day to religious worship and meditation. Richmond v. Moore, 107 Ill. 433. The court say in regard to this section, that it only prohibits labor that disturbs the peace and good order of society, not naming business.

McPherson v. Village of Chebanse, 114 Ill. page 49: This was a suit to recover a penalty from the defendant for keeping open his place of business in the village on Sunday. The point made was that the village had no power to pass the ordinance in question. It was held that the village had such power, and that the keeping open by persons of their places of business in a community on Sunday, for the exercise of the business of their ordinary calling, is a public and serious interference with observance of the day in its accustomed mode of observance.

In Eden v. The People, 161 Ill. 296, it is said in the opinion, commenting upon the difference between the legislation in England and many States in our Union: "This State has not, however, followed the other States in the adoption of the English statute, but we have legislated on this subject for ourselves, in a manner thought to be for the best interests of our people. That legislation will be found in 261 of our Criminal Code, as follows" (the section is then quoted). It is then said: "There is a wide and well marked distinction between the English statute and ours. The English statute prohibits labor and business on Sunday, while our statute merely prohibits labor and amusement which disturbs the peace and good order of society. In Richmond v. Moore, *supra*, in speaking of the difference between the two statutes, it is said (p. 433): 'A mere glance at that and our statute will show that they are materially different. That prohibits labor and business. Ours only prohibits labor or

amusement that disturbs the peace and good order of society. The offense of that statute is the performance of labor and business, and by ours it is the disturbance of the peace and good order of society. The British statute is much more comprehensive in its purposes and language than ours. Ours only prohibits labor that disturbs the peace and good order of society, not naming business, whilst the British statute renders the mere act of labor and business penal.' Under the law of this State, as it existed prior to the passage of the act in question, each and every citizen of the State was left perfectly free to labor and transact business on Sunday, or refrain from labor and business, as he might choose, so long as he did not disturb the peace and good order of society."

From these decisions of the court of last resort, construing said section 261, it appears the act of labor on Sunday is not an offense, but it must be done in a way not to disturb the peace and good order of society, and this must be proved beyond a reasonable doubt. The case we next refer to is a prosecution under said section.

Johnson v. The People, 42 Ill. App. 594: This was a prosecution under the section. The defendant had forty acres of oats in, and had arranged to reap the same. The machine got out of order and was not repaired until on a Friday evening. A few rounds were cut on that day; on Saturday the binder was run constantly, but at the close of that day eight acres remained unharvested. The oats were ripe, the straw was falling, and the grain scattered out badly. To save the oats he worked on Sunday till eleven o'clock in the forenoon; did not start again till two o'clock. His field was in plain view of the public road, leading to a church about a mile distant. Four witnesses testified for the prosecution, but one of whom was at church. He did not hear the machine at church.

Another witness lived a mile away and heard the machine. The two remaining witnesses were on the way to visit relatives; passed along the road leading to the church and saw plaintiff in error running the machine. There was

no evidence that any one was annoyed or disturbed by the work, unless that is to be deemed sufficiently proven by the fact that the four witnesses heard the noise made by the operation of the reaper. It was held that labor on Sunday is not of itself punishable under this section. The offense that is punishable is the disturbance of the peace and good order of society; unless it is proved that in doing the work the peace and good order of society was disturbed—which must be proved beyond a reasonable doubt— a conviction is not warranted.

Under the construction of said section, we are of the opinion the evidence did not establish the fact that the peace and good order of *society* was disturbed by defendant. People went by the place where he was plowing to the church, and no complaint was made, nor was there thereby any interference with their religious rights. None of the witnesses who testified thought the labor was of a character to require them to request defendant to cease. No disorder was occasioned by such labor, nor does it appear the peace of society was thereby disturbed. Defendant conscientiously believed Saturday, and not Sunday, was appointed by the law of God as a day of rest, and was following his religious convictions in using the day he did for labor. He was not intending thereby to disturb society, and was not aware he had done so. True, if he did by his labor disturb the peace and good order of society, his religious opinions would not shield him from the penalty, but we find the evidence does not support that charge. Entertaining the view expressed, dispenses with the necessity of commenting on the rulings of the court touching instructions and the admission of evidence, some of which rulings we think were erroneous.

The judgment is reversed and the cause not remanded, so that an appeal can be taken to the Supreme Court, and if this court has erred the error will be corrected.